UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ROBERT GROSS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:10-cv-000328-DBH |
| | ) |
| JOHN GRIFFIN, et al., | ) |
| | ) |
| Defendants | ) |

**RECOMMENDED DECISION ON
JOHN GRIFFIN'S MOTION TO DISMISS/SUMMARY JUDGMENT (Doc. No. 33)
AND RECOMENDATION THAT THE ACTION BE DISMISSED AGAINST "THE
UNKNOWN PERSON AS PERSONAL REPRESENTIVE OF THE ESTATE OF JAMES
RUSSELL" FOR FAILURE TO MAKE SERVICE**

In this action Robert Gross asserts that three defendants discriminated against him on account of gender and/or disability by failing to call upon him to provide vocational expert services to the Social Security Administration (SSA). According to Gross, he was wrongfully dropped from the roster of vocational experts (VEs) due to a preference for female vocational experts and/or because Gross has a speech impediment. Earlier in this action the claims against the Fiorentino Estate and the Personal Representative were dismissed with prejudice. (Doc. 43.) I now address the dispositive motion by John Griffin who was the Regional Director of Operations and Administration for SSA Region I in Boston. I have elected to approach this hybrid motion from the summary judgment standpoint rather than from the motion to dismiss vantage point.[1]

---

[1] Counsel for Gross begins his response to the summary judgment element of this dispositive motion with a historical critique of the legitimacy of summary judgment. (Resp. Mem. at 9-10, Doc. No. 40.) I, of course, cannot rely on such argument to address this pending motion; I must consistently apply the applicable federal and local rules that determine whether or not there is an issue worthy of trial.

Binding on Gross is his articulation of his claims against Griffin in his responsive memorandum:

> Here, Plaintiff alleges that Defendant Griffin's action violated his Fifth Amendment right to Due Process regarding Defendant Griffin's involvement in the failure to assign Vocational Expert duties to Plaintiff according to the standing policy of SSA. Additionally, the Plaintiff alleges that Defendant Griffin was responsible for violating his Fourteenth Amendment right to Equal Protection under the law, regardless of his gender or disability. This violation arises based on Defendant Griffin's approval of, or failure to remedy discriminatory practices when allocating cases to its roster of Vocational Experts by the Portland Office.

(Resp. Mem. at 11, Doc. No. 40.) Gross concedes: "Title VII of the Civil Rights Act does not extend its discrimination protections for employees to independent contractors; however, the protections of the Fourteenth Amendment are not similarly limited to employees, but protect everyone with whom the federal government interacts." (Id. at 13.)[2]

## DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trialworthy issue exists." McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995) (citing National Amusement Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995)).

---

[2] To the extent that Gross is attempting to assert a discreet Fourteenth Amendment claim for discrimination, I am a little unclear as to the pathway he envisions. However, based on the following analysis of supervisory liability for discrimination it is unnecessary to distinguish his discrimination claim under the Fifth Amendment from his Fourteenth Amendment theory.

# FACTS[3]

At the time of the events at issue, Gross was a vocational expert for the Office of Hearings and Appeals in Portland, Maine. (SMF ¶ 1; Griffin Aff. ¶ 4; Resp. SMF ¶ 1.) Judge James Russell was the Hearing Office Chief Administrative Law Judge for the Portland office. (SMF ¶ 2; Griffin Aff.¶ 4.)[4] John Griffin was the Regional Director of Operations and Administration for SSA Region I in Boston. (SMF ¶ 3; Griffin Decl. ¶ 1; Griffin Aff. ¶ 2; Resp. SMF ¶ 31.)

**Blanket Purchase Agreement**

There is no dispute that at the time of the events at issue, Gross was providing SSA with expert witness services on disability issues pursuant to a Blanket Purchase Agreement ("BPA"). BPAs are specifically written to avoid any guarantee of employment. Pursuant to a BPA, there is no contractual relationship between the parties until an offer of an assignment is made, and the offer is accepted. (SMF ¶¶ 4,5,6; Resp. SMF ¶ 4,5,6.) However, pursuant to a BPA, once there is such a contractual relationship, the BPA terms are followed. (SMF ¶ 7; Griffin Aff. ¶ 13.)[5]

The BPA that applied to Gross is attached as Exhibit 12, pages 1 to 43, which provides as follows: "Contractor shall provide expert witness services when ordered by an authorized

---

[3] Gross has not filed a statement of additional fact. I have relied on the express points he made in his response to Griffin's statement of fact as supported by record citation. There are many more factual assertions in Gross's supporting declaration that may or may not be material to his claims but he has failed to use this factual fodder in countering the defendant's statement of fact. See Dist. Me. Local R. 56. Gross's factual recitation in his responsive memorandum has not been fully supported by his factual statements and record citations. I also note that Gross seems perfectly content with the manner in which Griffin has broken down the facts under the different headings.

[4] Gross indicates that Russell's tenure coincides with most but not all of the period relevant to this complaint. He thinks that Judge Melanson may have served as a temporary Acting ALJ in charge. (Resp. SMF ¶ 2; Gross Decl. 17.) A summons issued as to Russell but there was no acceptance of service. Judge Melanson has not been named as a defendant.

[5] Relying on his own declaration, Gross attempts to qualify this statement by maintaining that the SSA does not support the abridging or complete disregard of its own expert selection policies in Portland, Maine or the Boston/New England region. He maintains that his circumstances would place the validity of all SSA decisions which utilized vocational expert services under question. (Resp. SMF ¶ 7; Gross Decl. ¶ 22.)

ordering official for the period effective with the date shown in Block 3 [10/01/04] through 9/30/2006." As provided in the BPA, and expressly in accordance with FAR 52.212-4, "the Contract Terms and Conditions," as amended, "the presiding Administrative Law Judge (ALJ) will perform inspection and acceptance of services at the time the services are rendered. The ALJ's signature as the 'Receiving Official' on the original Call Order Form serves as documentation of acceptance. The ALJ shall only sign as the receiving official *after* the contractor has signed the form." (SMF ¶ ¶ 8, 9; Resp. SMF ¶¶ 8,9; Ex. 12 at 8.) In accordance with the BPA, "[i]f the Government determines that a contractor employee or applicant is unsuitable," the contractor will be advised in writing that he or she "may not continue to perform ... under the contract." (SMF ¶ 10; Ex. 12 at 18.) Gross qualifies by stating that the government did not find his work unsuitable and he was not requested not to continue to perform; his contract was not renewed at the end of the contract period. (Resp. SMF ¶ 10; Griffin Aff. ¶ 10.)

**The ALJ's Role**

There is no dispute that in their official capacity, ALJs are provided with a degree of independent leeway with respect to how hearings are scheduled, heard and decided. In any particular case, the ALJ determines if there is a need for a VE. If an ALJ determines there is a need for VE testimony, a VE is contacted from the roster for that particular office. (SMF ¶¶ 11, 12, 13; Resp. SMF ¶¶ 11, 12, 13.)

In Griffin's view, the ALJs in each office are in the best position to judge the VE's expertise; it is only by witnessing the VE's testimony during a hearing, or perhaps by reviewing the VE's responses to an interrogatory request, that an ALJ would be able to make an assessment and determine that a VE did not have the requisite ability. (SMF ¶14; Griffin Aff. ¶ 7.) Gross counters that SSA pays vocational experts to testify to supplement a judge's area of expertise.

4

He indicates that he has a Master's degree in rehabilitation counseling and twenty-five years of work experience in vocation evaluation and rehabilitation. In all these years Gross routinely answered interrogatories regarding testimony of other VEs. (Resp. SMF ¶ 14; Gross Decl. ¶¶ 4, 15.)

### Chief ALJ Russell's Decision Regarding Gross

The following sequence of facts is in dispute. According to Griffin, on January 7, 2005, Chief ALJ Russell notified the Boston Regional Office that the Portland Office did not wish to renew Gross's BPA and that Gross did not have sufficient mastery of the vocational guidelines pertinent to SSA disability determinations. (SMF ¶ 15; Griffin Decl. ¶ 4; Griffin Aff. ¶ 5 & Ex. 18 at 1-2.) On January 7, 2005, Chief ALJ Russell confirmed in writing the following: "Dear Fellow Judges, I have informed region that the VE [Vocation Expert] contracts of Mr. Gross ... should not be renewed because there was a consensus among us that too often [he] did not show sufficient mastery of the vocational guidelines pertinent to SSA disability determinations...." (SMF ¶ 16; Ex. 18 at 1.)[6] The decision not to renew a BPA was based on a consensus of the Office ALJs; in Gross's case, Chief ALJ Russell spoke for the Portland Office. (SMF ¶ 17; Griffin Aff. ¶ 6.) For the administrative actions he took, Griffin relied on Chief ALJ Russell's email and letter (Ex. 18, at 1-2), as well as Griffin's understanding that ALJ Russell and the other ALJs had made various decisions not to procure the services of Gross. (SMF ¶ 18; Griffin Decl. ¶ 6.)

Gross responds with a reassertion of credentials: he has maintained national certifications as a "Certified Rehabilitation Counselor"; he has a master's degree; he has ten

---

[6] *(See also* Ex.18 at 2) ("The Portland Office does not want to renew the VE contracts for Robert E. Gross ... because it is the general consensus of our judges that [he] too often [does] not show sufficient mastery of the vocational guidelines pertinent to SSA disability determinations").

5

years of work in the rehabilitation field; and he has spent twenty-five years working for SSA as a VE without incident. (Resp. SMF ¶ 15; Gross Dec. ¶¶ 3-4.) During the time working as a VE Gross never had an indication that his level of expertise was in question. (Resp. SMF ¶ 16; Gross Decl. ¶6.) Gross complains that he was terminated less than half the way through his three-year BPA. He states that BPAs would normally be reviewed in the late summer or fall and that it was not normal practice to review and not renew his contract twenty-one months prior to its renewal date. (Resp. SMF ¶ 17; Gross Decl. 6.) Even if the BPA did not guarantee the utilization of Mr. Gross's services as an expert witness, as a contractee Gross had an expectation that SSA would assign cases in a fair rotational manner as described in their HALLEX policy manual. He believes that he should have received seven-percent of cases each year but his caseload was far below this percentage. (Resp. SMF ¶ 18; Gross Decl. ¶¶ 11, 12.)

**Griffin's Office's Administrative Role**

With respect to vocational experts, the role of Griffin's office is largely administrative (SMF ¶ 19; Griffin Aff. ¶ 8; Resp. SMF ¶ 19.) Griffin's office is not in a position to directly control the rotational use of experts in any particular office. (SMF ¶ 20; Griffin Aff. ¶ 11.)[7] Griffin was not in a position to know any specific VE applicant's age, race, gender, religion, or disability status because that information was not requested as part of the BPA application process. (SMF 21; Griffin Aff. ¶ 8.) Griffin's office is not qualified to judge whether any particular VE lacks a sufficient mastery of the applicable guidelines. (SMF ¶ 22; Griffin Aff. ¶ 7.) If the Portland Office stopped using Gross because of his lack of mastery of vocational

---

[7] Gross's efforts to qualify this statement with a numerical hypothesis based on speculation (it even ends with a question mark) (Resp. SMF ¶ 20; Gross Decl. ¶ 12) is stricken.

6

guidelines, he may not have been utilized as often as others, but that is a matter outside of Griffin's area of responsibility. (SMF ¶ 23; Griffin Aff. ¶ 11.)

In an interesting choice of words given the current standard for supervisory liability applicable to constitutional claims against state and federal actors, Gross describes Griffin as being in charge of the oversight of the Portland area office "by implication." (Resp. SMF ¶ 21; Griffin Aff. ¶¶ 2,5.) With regards to Griffin's disavowal of sufficient ability to judge a VE's level of skills or expertise, Gross states that he submitted his resume to the SSA in 1980 when he applied for and obtained his first BPA and the judges were supposed to fill out rating sheets of the VEs but now this requirement has been removed from the form. (Resp. SMF ¶ 22; Gross Decl. ¶¶ 3,16.) Gross urges that his complaint covers a five-year period where in the last three years Gross was called to testify less than one-percent of the time. He highlights that at the same time it was claiming lack of mastery on Gross's part, the SSA sent him interrogatories to assess the proficiency of other VEs. (Resp. SMF ¶ 23; Gross Decl. 12, 13, 14, 20.)

**Griffin Had Not Met Gross**

At the time of the events at issue, Griffin had not met Gross. (SMF ¶ 24; Griffin Decl. ¶ 3; SMF ¶ 24.) At that time, Griffin did not know Gross's age, race, religion, or disability status; nor did Griffin consider Gross to be disabled or a member of a protected classification with respect to matters of alleged employment discrimination. (SMF ¶ 25; Griffin Decl. ¶ 3.) As part of the process of issuing or renewing a BPA, no individual in the Regional Office would routinely speak to or meet any of the vocational experts. (SMF ¶ 26; Griffin Aff. ¶ 8.)

Again, Gross responds by asserting that Griffin should have seen the document of his work relating to the SSA since 1980 and over the course of these twenty-five years Griffin could

7

have met Gross or read Gross's particulars. (Resp. SMF ¶ 25, 26; Griffin Aff. ¶ 2; Gross Decl. ¶ 12.)

**Vocational Expert Scheduling**

According to Griffin, support staff would assist the ALJs in scheduling hearings, and they were responsible for contacting the Vocational Experts. (SMF ¶ 27; Griffin Aff. ¶ 10.) All the support staff in an office would make use of the same roster of experts. (SMF ¶ 28; Griffin Aff. ¶ 10.) As most offices do not have a single person responsible for centralized scheduling of hearings, the scheduling and selection of VEs may be performed simultaneously by any number of people working with one of the several ALJs. (SMF ¶ 29; Griffin Aff. ¶ 10.)

Gross responds to this set of facts by reiterating his theory that statistically the assignment of cases should have averaged out to seven-percent each year but he was never called at that rate. (Resp. SMF ¶¶ 27, 29.) "Not only were female VEs selected more often than males, but also certain female VEs were selected much more often than could be explained by a roster-wide rotational selection process." (Resp. SMF ¶¶ 27, 29; Gross Decl. ¶ 12.) Gross does not believe that the same roster of experts was used by all support staff in the Portland office. (Resp. SMF ¶ 28; Gross Decl. ¶ 18.)[8]

## DISCUSSION

**John Griffin**

Gross's first amended complaint makes it clear that he is suing John Griffin only in his individual capacity. (1st Am. Compl. ¶ 2, Doc. No. 14.) Gross does not seek prospective relief as to any of his counts.

---

[8] Gross's assertions about Judge Russell and what he should have known about the roster do not create a genuine dispute apropos Griffin's liability without record support for a factual linkage between these individuals relating to Gross's assignments beyond Russell's decision to not renew Gross's BPA.

In my earlier recommended decision in this action I discussed the potential liability of federal actors for constitutional violations. Gross v. Griffin, 1:10-cv-00328-DBH, Docket No. 29 (D. Me. May 9, 2011), adopted, __ F. Supp. 2d, __, 2011 WL 2669175, 1 (D.Me July 6, 2011). For purposes of that recommended decision I simply assumed the existence of an interest protected by the Fifth Amendment due process clause based upon the allegations in the complaint relating to the Fiorentino estate. The allegations pertaining to Griffin's alleged liability as a regional supervisor require a different sort of analysis altogether.

*Supervisory liability*

With respect to the statement of a claim against Gross on either his Fifth Amendment or Fourteenth Amendment theories of discrimination based on gender and disability, Gross concedes that he never met Griffin and he makes it plain that his theory is that Griffin should have been more aware of the practice in the Portland office vis-à-vis VE assignment and exercised more supervision over the people making the assignment decisions. Gross asserts that Griffin "was in charge by implication" and maintains what he could have read Gross's particulars if he wanted to. Gross is expressly not faulting Griffin for fashioning a rights violating policy. Compare Dodds v. Richardson, 614 F.3d 1185 (6th Cir. 2010). Gross summarizes:

> Plaintiff contends that it was not his "insufficient mastery" of topics, which led, to his termination but rather the discriminatory practices of the Portland office's case assignment system. Mr. Griffin, as a Regional Supervisor had an obligation to Plaintiff to make sure that the policy for equal distribution of cases to Vocational Experts on the roster was enforced. This policy was designed to ensure the equal opportunity of the experts to work, as well as to ensure that the experts in front of the Board fairly represent a cross-section of society. Had this policy been followed, Plaintiff's rights would not have been violated. When Griffin allowed or approved the Portland Office's deviation from the existing policy of rotationally assigning cases, he endorsed or participated in an arbitrary and capricious violation of Plaintiff's due process interest.

> Additionally, Plaintiff contests Defendant Griffin's suggestion that he was not in a position to know the Plaintiff's gender or disability status. As a Regional Supervisor, Mr. Griffin, at the very least had constructive, or reasonably should have had knowledge of Plaintiff's gender. This knowledge combined with SSA's own statistics showing a vastly disparate assignment of cases to Vocational Experts on the roster, should have put Mr. Griffin on notice that discrimination was taking place. Mr. Griffin's failure to investigate further or remedy such inequality suggests his own purpose to continue such discrimination.

(Resp. Mem at 11-12.)

I recognize that Gross has set forth statistics in his complaint relating to the assignment pattern of which he complains. He has not incorporated these facts into his side of the summary judgment record. But even if I take those statistics into consideration, a plaintiff can no longer create a trial worthy issue of individual capacity supervisory liability on a conclusory assertion regarding a supervisor as far removed as Griffin was from the alleged decision making by maintaining that Griffin had constructive knowledge or "reasonably should have known" of the discriminatory conduct.[9]

The Ashcroft v. Iqbal majority addressed this dynamic on a claim of discrimination in a dissimilar factual milieu but a similar supervisory liability framework:

> Respondent … argues that, under a theory of "supervisory liability," petitioners can be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees." Iqbal Brief 45-46. That is to say, respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents. In a § 1983 suit or a Bivens action-where masters do not answer for the torts of their servants-the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government

---

[9] I highlight that Gross has not advanced any argument of deliberate indifference and that it would be inappropriate for him to do so in the context of his unconstitutional intentional discrimination claims. Compare Starr v. Baca, __ F.3d __, __, 2011 WL 2988827 (9th Cir. July 25, 2011)(addressing an Eighth Amendment deliberate indifference claim against a supervisor on a theory of failure to protect); Leavitt v. Correctional Medical Services, Inc., __F.3d __, __ 2011 WL 2557009, 12-13 (1st Cir. June 29, 2011) (discussing an Eighth Amendment deliberate indifference claim for inadequate medical care, including a claim against a supervisor).

> official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose <u>Bivens</u> liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

556 U.S. __, __, 129 S.Ct. 1937, 1949 (2009). There is no evidence in this record that supports a conclusion that "affirmatively links" Griffin to the alleged rights violating conduct. <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 274-75 (1st Cir.2009); <u>see</u> <u>also</u> <u>Santiago v. Warminster Tp.</u>, 629 F.3d 121, 130 (3d Cir. 2010). To create a trial worthy case against Griffin on the <u>Bivens</u> constitutional claims there must be record evidence from which to draw an inference that Griffin actively supported or condoned the alleged discrimination in the Portland area office. <u>Compare</u> <u>T.E. v. Grindle</u>, 599 F.3d 583, 588 -89 (7th Cir. 2010) (concluding, after analysis of <u>Iqbal</u>'s supervisory liability discussion, that there was sufficient evidence to defeat summary judgment regarding a supervisory liability discrimination claim against a supervisor who actively participated in a cover-up of a subordinate's sexual molestation of girls). Mere theoretical access to the records that would alert Griffin to Gross's gender and Griffin's potential ability to collect the statistics that Gross has now compiled in his complaint does not suffice to warrant an inference that Griffin intentionally condoned or engaged in the alleged discriminatory conduct by the other defendants in making VE assignments.

I further recognize that Gross suggests that he could find a more direct link between Griffin and the decisions made in the Portland office on VE assignments if he had more time for discovery.[10] However, Gross has not attempted to make a showing under Federal Rule of Civil Procedure 56(d). Gross has proceeded with his defense of the summary judgment arm of this

---

[10] No scheduling order has issued in the case to date.

motion by relying singularly on his declaration for record support, a declaration that relies heavily on his own speculation and assertions not supported by record support. See Flournoy v. Schomig, 418 Fed.Appx. 528, 532, 2011 WL 1585834, 3 (7th Cir. 2011) (unpublished) (affirming grant of summary judgment on a prisoner's race-based equal protection claim because a lack of evidence produced by the plaintiff as required by Iqbal, rejecting a spoliation of the evidence argument). Gross's memorandum in response to this dispositive motion lays out a long history of counsel-assisted requests for information from the SSA on the assignment process. In other words, he has been diligently investigating the complained-of conduct for over six years and he has not been able to provide a sound theory why Griffin is liable beyond one of 'he should have known.' The tenor of this memorandum when it comes to the summary judgment analysis is that he should be given not only more time for discovery but proceed to trial 'without passing go' to allow the facts to come out. The problem with Gross's quest for more time to substantiate Griffin's participation in the VE assignments in Portland is that the Court has before it Griffin's Declaration and his EEO Affidavit. (Doc. Nos. 34-1 & 34-2.) Without a better explication by Gross, I can see no pathway of discovery that would assist Gross in contravening Griffin's sworn statements narrating an absence of an affirmative link sufficient to hold him accountable for the conduct of the two deceased ALJs. There is no reason to suppose that Griffin would testify in contradiction to these statements. Gross has not indicated what further documentation in the wake of his Freedom of Information Act requests might be discoverable that would undermine Griffin's sworn statements.

I have addressed this dispositive motion under the summary judgment framework. But even if I were to base this recommended decision on the motion to dismiss standard I would recommend judgment enter in favor of Griffin based on the complaint allegations against him

and the supervisory liability standard discussed above. The above discussion of Iqbal alone would seem to dictate this.

### *Qualified immunity*

Gross, citing my prior recommendation, argues that qualified immunity cannot be decided as to Griffin in the context of a motion to dismiss. (Resp. Mem. at 7-8, Doc. No. 40.) Addressing this current set of pleadings from the summary judgment perspective, I have concluded that Gross has not created a genuine dispute of fact material to a claim against Griffin for a violation of his federal rights.[11] It is unnecessary to delve further into the question of Griffin's entitlement to qualified immunity unless the Court concludes that Gross has carried his burden of generating a genuine dispute that Griffin is affirmatively linked to a constitutional violation.

### The Estate of James Russell

On January 31, 2011, a summons issued that included "UNKNOWN PERSON AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JAMES RUSSELL." (Doc. No. 17.) Service was accepted as to the other defendants by the United States Attorney for the District of Maine. There has been no executed return as to this defendant. Gross, who is represented by council, has not effectuated service within the 120-days provided under Federal Rule of Civil Procedure 4(m). Pursuant to that rule I recommend that the case be dismissed without prejudice as to this defendant.

---

[11] This is actually the first step in the qualified immunity analysis but my point is that no further steps need to be taken unless the Court disagrees with the analysis of the Griffin's right to judgment on the grounds that there is no trial worthy claim against Griffin in his individual capacity as a supervisor.

**CONCLUSION**

For these reasons I recommend that the Court grant judgment with prejudice in favor of Griffin on Gross's claims against this defendant. Furthermore, I recommend that the Court dismiss without prejudice Gross's claims against the estate of James Russell and its representative because Gross has failed to achieve service as required under Federal Rule of Civil Procedure 4(m). These two dispositions would mark the closing of the case.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

August 3, 2011.